SATISH MEHTANI et al., Respondents, v NEW YORK LIFE INSURANCE COMPANY et al., Appellants, et al., Defendants. (Action No. 1.)

NEW YORK LIFE INSURANCE COMPANY, Plaintiff, v SATISH MEHTANI and SARUP N. SHARMA, Defendants. (Action No. 2.)

First Department, February 14, 1989

### APPEARANCES OF COUNSEL

*Irwin M. Berg* of counsel *(Fuchsberg & Fuchsberg,* attorneys), for respondents.

*Peter M. Panken* of counsel *(Daniel S. Greenfeld* and *Kenneth R. Davis* with him on the brief; *Parker, Chapin, Flattau & Klimpl,* attorneys), for appellants.

### OPINION OF THE COURT

KASSAL, J.

■ Section 296 (13) of the Executive Law, commonly referred to as the "Arab Boycott Law", does not apply to the cancellation of an employment contract or the discharge of an employee where the alleged act of discrimination did not occur in the course of an organized boycott or blacklisting.

In August 1982, plaintiffs-respondents, Satish Mehtani and Sneh Mehtani, his wife, commenced the above-captioned action No. 1 against defendants-appellants, New York Life Insurance Company (New York Life) and its senior vice-president in charge of marketing, Lee Buck, and defendants "John Doe" and "Richard Roe", investigators assigned to Buck's department. The original verified complaint stated two causes of action, the first alleging that Satish had been wrongfully

discharged from the employ of New York Life because he was disliked by Buck and that Doe and Roe had conspired with Buck toward that end, and the second alleging that Sneh had sustained damages because the notice of termination had been deliberately timed to arrive one day before she and Satish were to be married.

Following a decision rendered by the Court of Appeals on March 29, 1983, holding that, "This court has not and does not now recognize a cause of action in tort for abusive or wrongful discharge of an employee" *(Murphy v American Home Prods. Corp.,* 58 NY2d 293, 297), plaintiffs amended their complaint to add the allegation that the discharge of Satish, an American citizen born in India, was racially motivated, and to assert a claim for loss of consortium on behalf of his wife, Sneh. The allegation of racial discrimination was grounded in a 1976 incident in which Lee Buck was said to have angrily confronted Satish at a special club for New York Life's most successful salespersons, saying, "Who the hell do you think you are? These are my seats. You damn foreigners think that you can get whatever you want". Satish further alleged that three years later, in December 1979, Buck had a private meeting with him in which he stated: "Don't think I have forgotten you. I am going to get your ass out of New York Life the first chance that I get. I have had enough from you f——ing Indians. I would like to get rid of every one of you. You think you own the place. You Indians come to this country and you think everything is coming to you."

At about the time that this meeting took place, the circumstances under which Satish had sold a life insurance policy to a woman who died six months thereafter were under investigation. As a result of that investigation, New York Life commenced an action in July 1982, designated herein as action No. 2, against Satish and a medical doctor, Sarup Sharma, alleging that they had conspired to fraudulently obtain the policy without a medical examination for the woman, who had a serious heart condition. The two lawsuits were subsequently consolidated as above captioned.

In denying defendants-appellants' motion for summary judgment dismissing Satish and Sneh Mehtani's complaint, Special Term held that there existed a question of fact as to whether Satish was an independent contractor or an employee, an issue bearing on the applicability of Executive Law § 296 (1) (a). The court further held that even if Satish were found to be an independent contractor and thus ineligible for relief

pursuant to Executive Law § 296 (1) (a), he could nevertheless prosecute a claim of racial discrimination under Executive Law § 296 (13). With respect to Sneh's loss of consortium cause of action, the court found that it was viable because Satish's discharge had become effective after the date of their marriage.

We first address the issue of whether there exists a genuine question of fact regarding Satish's status with New York Life. It is undisputed that the proscription against unlawful discriminatory practices contained in Executive Law § 296 (1) (a) applies solely to employees and not to independent contractors. The statute provides as follows:

"1. It shall be an unlawful discriminatory practice:

"(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

Satish's association with New York Life commenced on July 1, 1971, when the parties entered into an Apprentice Field Underwriter's Agreement for an initial two-year period. This contract, which authorized Satish to solicit applications for insurance policies on behalf of New York Life, and outlined the terms and conditions upon which he would do so, contained the following provision: "Neither the term 'Field Underwriter' * * * nor anything contained herein or in any of the rules or regulations of [New York Life] shall be construed as creating the relationship of employer and employee between [New York Life] and the Field Underwriter. Subject to the provisions hereof and within the scope of the authority hereby granted, the Field Underwriter, as an independent contractor, shall be free to exercise his discretion and judgment with respect to the persons from whom he will solicit applications, and with respect to the time, place, method and manner of solicitation and of performance hereunder."

At the expiration of the initial period, Satish continued his work as a field underwriter, with his compensation consisting solely of commissions. Consistent with the practice utilized for independent contractors, New York Life did not deduct any withholding taxes from these commissions. Other indicia of independent contractor status were Satish's hiring of a secretary whose salary was paid by Satish, not New York Life,

Satish's setting of his own work hours, and the express authority to place insurance applications with companies other than New York Life when, in his professional judgment, doing so would further the applicant's best interests. These factors rebut any claim that New York Life "exercise[d] control over the results produced by [Satish] or the means used to achieve the results" and, indeed, clearly support the contractual definition of his status. *(Matter of 12 Cornelia St. [Ross],* 56 NY2d 895, 897; *Matter of Watz [Equitable Life Assur. Soc.—Ross],* 60 AD2d 259, 261-262, *affd* 46 NY2d 876; *cf., Matter of Herzberg [Major Muffler Centers—Roberts],* 96 AD2d 1114.)

██. Satish's assertions to the contrary fail to establish any genuine issues of fact and, at best, are suggestive solely of "incidental control" which by itself is legally insufficient to constitute an employer-employee relationship. *(Matter of Ted Is Back Corp. [Roberts],* 64 NY2d 725, 726.) Thus, it was error for Special Term to hold that there existed an issue of fact regarding Satish's status with New York Life which would defeat summary judgment.

Satish further claims that he may seek redress for the alleged acts of discrimination under Executive Law § 296 (13). This statute was enacted in 1975, in part "to curb the discriminatory business practices of corporations which resulted from the pressures of foreign governments, including the Arab boycott of Jewish businesses and individuals". *(Holly v Pennysaver Corp.,* 98 AD2d 570, 572.) It provides as follows:

"It shall be an unlawful discriminatory practice (i) for any person to discriminate against, boycott or blacklist, or to refuse to buy from, sell to or trade with, any person, because of the race, creed, color, national origin or sex of such person, or of such person's partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers or customers, or (ii) for any person wilfully to do any act or refrain from doing any act which enables any such person to take such action. This subdivision shall not apply to:

"(a) Boycotts connected with labor disputes; or

"(b) Boycotts to protest unlawful discriminatory practices."

██ In the 13 years since its enactment, Executive Law § 296 (13) had never been applied in any case not involving collective action or action aimed at a particular group, until the decision appealed herein. As summarized in *General Elec. Co.*

*v New York State Assembly Comm. on Governmental Operations* (425 F Supp 909, 911), the purpose of the "so-called 'Arab Boycott' " legislation is "to eradicate discrimination against citizens of New York State in terms of such boycotts or blacklisting because of race, color, creed or national origin". Letters from various legislative leaders in support of the passage of the legislation reflect this limited purpose. Thus, for example, on July 21, 1975, the Senate Majority Leader wrote: "Reports from responsible sources indicate that the Arab OPEC nations' newfound economic strength is being used to discriminate against and boycott certain religious and ethnic groups. New York State and the United States have for many years outlawed discrimination based on race, creed, national origin and sex, but this new approach to discrimination by foreign interests seems to require strengthening of existing laws to assure continued strong prohibitions. This bill offers that strong approach."

In a memorandum of approval, dated August 4, 1975, Governor Hugh Carey observed: "This bill prohibits commercial boycotts and blacklisting". (1975 McKinney's Session Laws of NY, at 1765.)

In light of the clear legislative intent underlying Executive Law § 296 (13), we must reject Satish's contention that this statute is applicable to a cancellation of contract or wrongful discharge from employment that is unaccompanied by any form of blacklisting or commercial boycott. So expansive a reading of the statute is neither supported by its legislative history nor its terms.

■ Finally, we note that Sneh's cause of action for loss of consortium is a derivative one which must fall with the dismissal of Satish's claims *(Liff v Schildkrout,* 49 NY2d 622, 632-633), and that, in any event, "[t]he spouse of an employee alleging discrimination under the Executive Law is not a 'person aggrieved' within the meaning of the statute and a cause of action for loss of consortium cannot be stated under the Executive Law". *(Belanoff v Grayson,* 98 AD2d 353, 358.) Moreover, damages for loss of consortium are not recoverable where, as here, the alleged wrongful conduct preceded the marriage. *(Briggs v Butterfield Mem. Hosp.,* 104 AD2d 626.) In this context, we are not persuaded that the actual effective date of the discharge, which was subsequent to the marriage, is controlling, since the underlying allegations were based, in part, upon the prewedding notification.

Accordingly, the order, Supreme Court, New York County (Charles Ramos, J.), entered June 14, 1988, which denied defendants-appellants' motion for summary judgment dismissing the complaint in action No. 1 should be reversed, on the law, the motion granted, and the complaint dismissed in its entirety, without costs.

MURPHY, P. J., SULLIVAN and CARRO, JJ., concur.

Order, Supreme Court, New York County, entered on June 14, 1988, unanimously reversed, on the law, the motion granted, and the complaint dismissed in its entirety, without costs and without disbursements.