*432
 
 OPINION OF THE COURT
 

 Titone, J.
 

 Plaintiff insurance agent brought a discrimination claim against defendant insurance company for termination of her agency contract allegedly on the basis of her gender, age and marital status. The question before us is whether the suit may be predicated on Executive Law § 296 (1) (a), which prohibits discrimination in employment, or under section 296 (13), which prohibits discrimination in commerce or trade. For the following reasons, we affirm the holdings of the courts below that plaintiff could not avail herself of the protections of either section under the circumstances of this case.
 

 Defendant G. James Blatt runs a "general agency” through which he markets the insurance products of defendant Massachusetts Mutual Life Insurance Company. In 1981, defendant Blatt hired plaintiff Marilyn Scott as an insurance agent under a career contract. In 1987, plaintiff became a district manager responsible for running a separate agency for defendant at a new location and for recruiting insurance agents to expand the company’s markets. The agreement contained in the career contract executed by the parties in 1981 stated that "[njothing in this contract shall be construed as creating the relationship of employer and employee between” defendants and plaintiff. Both the career contract and the district manager contract were terminable at will by either party.
 

 Defendant Blatt terminated plaintiff’s career contract and series 6 license to sell certain mutual funds and annuities in June 1992. Plaintiff then commenced this action in December 1992 against both defendants pursuant to New York State’s Human Rights Law (Executive Law § 290
 
 et seq.).
 
 Plaintiff alleged that defendant Blatt discriminated against her in employment by refusing to promote her, and by terminating her agency contract and her series 6 license, on the basis of her gender, age and marital status, and that defendant Massachusetts Mutual is liable as Blatt’s employer for his acts, which it ratified. Defendants moved for summary judgment dismissing the complaint, contending that, as an independent contractor, plaintiff was not entitled to bring a claim under the Human Rights Law. In response, plaintiff contended that she was defendants’ employee, and could proceed pursuant to Executive Law § 296 (1) (a), and alternatively that Executive Law § 296 (13) covers discrimination against independent contractors in these circumstances.
 

 
 *433
 
 Supreme Court granted defendants’ motion and dismissed the complaint. The court concluded that plaintiff was an independent contractor not eligible for protection under Executive Law § 296 (1) (a) and had failed to raise a triable issue of fact concerning her claimed status as an "employee.” The court also rejected plaintiffs claim that the suit could be brought pursuant to Executive Law § 296 (13), holding that "that subdivision * * * is aimed at curbing discrimination in a wide range of commercial activity, such as commercial boycotts and blacklisting.” The Appellate Division affirmed, without opinion. We granted plaintiffs motion for leave to appeal, and now affirm.
 

 Plaintiff first seeks to pursue her discrimination claim under Executive Law § 296 (1) (a). That section provides that "[i]t shall be an unlawful discriminatory practice * * * [f|or an employer * * * because of the age, race, creed, color, national origin, sex, or disability, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.”
 

 Proceeding from the position that this section governs discrimination only in traditional employer/employee relationships, and not in the employment of independent contractors, plaintiff contends only that dismissal of her claim pursuant to Executive Law § 296 (1) (a) on summary judgment was improper because she has raised a triable issue concerning whether she was, in fact, defendant Massachusetts Mutual’s employee rather than an independent contractor. We disagree.
 

 It is by now well settled that "a determination that an employer-employee relationship exists may rest upon evidence that the employer exercises either control over the results produced or over the means used to achieve the results”
 
 (Matter of Ted Is Back Corp. [Roberts],
 
 64 NY2d 725, 726). Minimal or incidental control over one’s work product without the employer’s direct supervision or input over the means used to complete it is insufficient to establish a traditional employment relationship
 
 (id.).
 

 Here, the parties’ submissions on defendants’ summary judgment motion establish that plaintiff was responsible for financing her own operating expenses and support staff, was paid by performance rather than a salary, did not have Federal, State or local taxes withheld from her pay, could sell
 
 *434
 
 competitors’ products and had agreed by contract to operate as an independent contractor. Although plaintiff alleges that she was required to recruit and train agents according to defendant Massachusetts Mutual’s guidelines, that was true only for agents whose hiring was financed by defendant and not by plaintiff, and, in any event, reflects only minimal control over plaintiff’s own work. Additionally, the facts that plaintiff was compelled to attend regular company meetings and was asked to draw up a job description for her position are not inconsistent with her status as an independent contractor. Rather, the submissions establish, at most, that defendants exercised minimal control over plaintiff’s own daily work product.
 

 The only conclusion to be drawn from these facts is that plaintiff operated her office with a high degree of independence not found in a traditional employer/employee relationship
 
 (see, Matter of 12 Cornelia St. [Ross],
 
 56 NY2d 895, 897-898). Thus, because plaintiff has failed to raise a material issue of fact concerning her employment status or the degree of control defendants exercised over the means she used to perform her work, the motion to dismiss her claim under Executive Law § 296 (1) (a) was properly granted
 
 (see, Mehtani v New York Life Ins. Co.,
 
 145 AD2d 90, 94).
 

 Plaintiff alternatively argues that, even assuming she was an independent contractor, her discrimination claim may proceed under Executive Law § 296 (13). Plaintiff has failed to allege any facts that bring her claim within this provision.
 

 Executive Law § 296 (13) provides, in full, that "[i]t shall be an unlawful discriminatory practice (i)
 
 for any person to discriminate against,
 
 boycott or blacklist, or to refuse to buy from, sell to or trade with,
 
 any person,
 
 because of the race, creed, color, national origin or sex of such person, or of such person’s partners, members, stockholders, directors, officers, managers, superintendents, agents, employees, business associates, suppliers or customers, or (ii) for any person willfully to do any act or refrain from doing any act which enables any such person to take such action. This subdivision shall not apply to: (a) Boycotts connected with labor disputes; or (b) Boycotts to protest unlawful discriminatory practices” (emphasis added).
 

 Apparently unable to allege that defendants engaged in a formal boycott or blacklisting of females or persons of plaintiff’s age or marital status, plaintiff instead submits that her
 
 *435
 
 claim, which alleges general discrimination by defendants against her, falls within the conduct covered by section 296 (13) when the statutory language italicized above is isolated from the remainder of the section’s terms. This contention does not withstand scrutiny.
 

 Under settled precepts of statutory construction, the italicized language should not be read in isolation, but within the context of the entire statute, giving relative meaning and effect to each of the section’s remaining terms
 
 (see,
 
 McKinney’s Cons Laws of NY, Book 1, Statutes § 98). The statute’s specific reference to boycotts, blacklisting and refusals to deal indicates that this subdivision of the Human Rights Law is directed at curbing, in particular, types of business practices that involve the concerted use of economic means to disadvantage the trade or commercial activities of a member of a targeted group
 
 (see,
 
 Black’s Law Dictionary [6th ed], definitions of boycott and blacklist;
 
 see also, Holly v Pennysaver Corp.,
 
 98 AD2d 570, 572). Since the term "discriminate” immediately precedes the list of terms including boycott, blacklisting and refusals to trade, that term should be construed to refer to similar types of commercial activity.
 

 Indeed, were we to accept plaintiffs approach and conclude that the statute outlaws general discrimination by “any person” against "any person,” there would be no need for the numerous remaining subdivisions of the statute, which prohibit particular discriminatory practices in certain well-defined areas, such as in residential rental leases
 
 (see, e.g.,
 
 Executive Law § 296 [2-a]), in places of public accommodation or amusement
 
 (id.,
 
 § 296 [2] [a]), in defining membership on a real estate board
 
 (id.,
 
 § 296 [5] [d]) or in referral services provided to applicants by an employment agency
 
 (see, id.,
 
 §296 [1] [b]). Accordingly, we decline to adopt an interpretation of the intended scope of section 296 (13) which would render the statute’s remaining provisions mere surplusage.
 

 In any event, any ambiguity in the scope of conduct prohibited by the statute is quickly dissipated by reference to its legislative history, which reveals the single-minded purpose of the new law. Enacted in 1975, and commonly referred to as the "Arab Boycott Law”
 
 (see, Mehtani v New York Life Ins. Co.,
 
 145 AD2d 90, 95,
 
 supra),
 
 section 296 (13) was designed specifically to address such then-prevalent evils as the use by Arab OPEC nations of their "new-found economic strength * * * to discriminate against and boycott certain religious and
 
 *436
 
 ethnic groups” (Bill Jacket, L 1975, ch 662, Cosponsor Anderson’s Mem in Support), as well as apartheid practices employed in South Africa and Rhodesia
 
 (id.,
 
 Mem of Cosponsor Steingut).
 

 While the enactment found its impetus in the Arab boycott of Jewish businesses, it was drafted more broadly to prohibit not only boycotts imposed by foreign entities, but any business tactics, utilized in New York State or against a New York resident or corporation, which are driven by "religious or racial bigotry” (Governor Carey’s Mem of Approval, 1975, NY Legis Ann, at 442, 443) or other prohibited discriminatory animus
 
 (see, Holly v Pennysaver Corp.,
 
 98 AD2d 570, 572,
 
 supra).
 
 Thus, although a liberal reading of this type of remedial statute is warranted for the accomplishment of its purposes
 
 (see, City of Schenectady v State Div. of Human Rights,
 
 37 NY2d 421, 428), the reading plaintiff advances would not promote the purpose of this section, which is to curb types of "economic warfare” used as part of a scheme to injure a New York resident or domestic corporation in national or international business because of ethnicity, gender or other protected status (Bill Jacket, L 1975, ch 662, Budget Report on Assembly Bill No. 7640-B;
 
 see also, id.,
 
 State Div of Human Rights Letter to Governor’s Counsel [the bill "is intended to deal with boycotts in connection with business and not with personal matters, such as the activities of individuals who prefer to buy their food from persons of their own race or creed * * * or who wish to boycott grapes to support the United Farm Workers Union”]).
 

 Importantly, the absence of evidence of a formal boycott or blacklisting campaign will not be fatal to a discrimination claim under section 296 (13). For example, evidence establishing that a defendant engaged in a pattern of conduct that commercially disadvantaged only members of a protected class may be sufficient to defeat a summary judgement motion
 
 (see, e.g, Harvey v NYRAC, Inc.,
 
 813 F Supp 206 [ED NY 1993] [claim that defendant’s refusal to rent luxury car was racially motivated rather than residence-based survived motion for summary judgment where plaintiff submitted proof that defendant’s stated policy of declining to rent to residents of a certain borough was not applied to all residents of borough]).
 

 Applying those principles to this case, we conclude that plaintiff’s discrimination claim under Executive Law § 296 (13) was properly dismissed. Assuming that the termination of
 
 *437
 
 plaintiffs agency contract qualifies as business conduct or, more specifically, a refusal to trade within the statute’s scope, plaintiff has otherwise failed to submit sufficient proof to establish that the contract termination was propelled by or a result of defendants’ desire to collectively discriminate against a protected class that includes plaintiff
 
 (see, West v Mohawk Commercial Carpets,
 
 183 AD2d 182, 183). Plaintiff has not shown that the termination was the result of a blacklisting or commercial boycott of women, or of persons of her age or marital status
 
 (Mehtani v New York Life Ins. Co.,
 
 145 AD2d, at 95,
 
 supra; cf., Holly v Pennysaver Corp.,
 
 98 AD2d 570,
 
 supra).
 
 Nor has she alleged any facts to establish that the contract cancellation was part of a larger pattern of dealing or policy instituted by defendants in a concerted effort to disadvantage females economically. Plaintiffs bare allegations that no other women had achieved district manager status in defendant’s company, without some other proof establishing, for example, a policy or pattern of rejection of qualified females who had applied for such posts, is insufficient to defeat defendants’ motion for summary judgment.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Simons, Bellacosa, Smith, Levine and Ciparick concur.
 

 Order affirmed, with costs.