Neil TAGARE, Plaintiff,

v.

NYNEX NETWORK SYSTEMS COMPANY, Flag Limited, Nynex Network Systems (Bermuda) Limited, Nynex Corporation, Nynex Worldwide Services Group, Joseph Timpanaro, Gabriel Yackanich, John Parry and Nicholas Reda, Defendants.

No. 95 CIV. 0644(WCC).

United States District Court, S.D. New York.

Dec. 8, 1997.

Lovett & Gould, White Plains, NY (Craig T. Dickinson, of counsel), for Plaintiff.

Orrick, Herrington & Sutcliffe LLP, New York, NY (Barbara Moses, Martin L. Schmelkin, of counsel), for Defendants.

## *OPINION AND ORDER*

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Sunil ("Neil") Tagare brings this employment discrimination and breach of contract action against several defendants—NYNEX Network Systems Company ("NNS"), NYNEX Network Systems (Bermuda) Limited ("NNS(B)"), FLAG Limited ("FLAG"), NYNEX Corporation ("NYNEX"), NYNEX Worldwide Services Group ("Worldwide"),[1] Joseph Timpanaro, Gabriel Yackanich, John Parry, and Nicholas Reda. Tagare asserts claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, on the grounds that defendants allegedly discriminated against him on the basis of his national origin and skin color and in retaliation for his opposition to such discrimination. He also asserts a breach of contract claim.

This Court has previously determined that (1) the Title VII claim runs against defendants NNS, NNS(B), FLAG, NYNEX, and Worldwide only; (2) the NYSHRL claim runs against all defendants; and (3) the breach of contract claim runs against defendant NNS only. *See Tagare v. NYNEX Network Systems Co.,* 921 F.Supp. 1146 (S.D.N.Y.1996) (WCC).

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. As explained in greater detail below, we grant summary judgment in favor of defendants with respect to all claims.[2]

## BACKGROUND

Plaintiff Tagare is a native of India, a citizen of the United States, and a domiciliary of New Jersey. Defendant NNS(B) is a subsidiary of defendant NNS, which is a subsidiary of defendant Worldwide, which in turn is a subsidiary of defendant NYNEX. NNS, Worldwide, and NYNEX are Delaware corporations whose principal places of business are in New York. NNS(B) has its principal place of business in Bermuda, where it is incorporated. Defendant FLAG is a Bermuda corporation, with its principal place of business in Bermuda, in which NNS owns stock. NNS(B) serves as the exclusive marketing agent for FLAG and receives commissions based on sales of capacity on FLAG's submarine cable. Individual defendants Timpanaro, Yackanich, Parry, and Reda were, at all relevant times, executives of various corporate defendants. They are all domiciled in either New York or Bermuda.

In the late 1980s, Tagare developed the concept of privatizing undersea fiberoptic cable projects for the purpose of establishing an international telecommunications system. NNS undertook the project—called the Fiberoptic Link Around the Globe (the "FLAG Project")—around 1990.

Beginning in 1991, Tagare entered into a series of four successive contracts with NNS. Only the fourth and final contract—the "Agreement for Consulting Services"—is at issue in this action. The Agreement was signed on August 13, 1993 by Tagare on his own behalf and as president of his company, Telematics Business Development Company ("Telematics"), and by defendant Timpanaro on behalf of NNS. The Agreement ran from

---

1. NYNEX Worldwide Services Group has been renamed NYNEX Worldwide Communications and Media Group. (McCarthy Decl. ¶ 2.)

2. Even though we dismiss Tagare's Title VII claims—the claims on which our federal question jurisdiction is based—we retain original jurisdiction over the NYSHRL and contract claims by virtue of the parties' complete diversity. *See* 28 U.S.C. § 1332.

August 1, 1993 to July 31, 1994, at which point it was renewed through July 31, 1996.

As background, we will briefly describe the Agreement, the actual relationship between Tagare and the defendants, and Tagare's breach of contract claim.

## A. *The Agreement*

The Agreement called for Tagare, through Telematics, to "perform certain marketing and business development activities with respect to the [FLAG Project] and to undertake certain defined activities relative to the sale of cable capacity." (Berg Aff., Exh. 3, p. 1 (hereinafter "Pl. Exh. 3").) More specifically, the Agreement provided that Tagare, as a "Vice President of Marketing and Business Development" for Project FLAG, would (1) "supervise the sales and marketing team provided by [NNS] and plan/implement the Marketing Plan"; (2) "travel worldwide as required to conduct the sales, marketing and business development activities in accordance with the Marketing Plan"; and (3) "plan and conduct Data Gathering Meetings and other marketing activities as authorized by [NNS]." (Pl. Exh. 3, Schedule 1, ¶ I(1)-(4).)

The Agreement expressly stated that Telematics/Tagare would be considered an independent contractor rather than an employee:

> Such WORK as CONSULTANT renders under this Agreement shall be rendered in its capacity as an independent contractor.

> \* \* \* \* \* \*

> CONSULTANT acknowledges that it or its associates and/or employees shall not by reason of this Agreement or performance of services under this Agreement be considered an employee of [NNS] or entitled to any [NNS] benefits.

> \* \* \* \* \* \*

> CONSULTANT acknowledges that its relationship with [NNS] under the Agreement is exclusively that of an independent contractor for [NNS] and not any other

relationship, including partner, agent, or employee.

(*Id.* ¶¶ 14, 21.)

The Agreement provided that Telematics and Tagare "shall work exclusively for [NNS] on Project FLAG during the terms of this Agreement or any renewal thereof." (*Id.* ¶ 2.) As an exception to this exclusivity clause, Tagare was permitted to work with Telematics or Overseas Communication Corporation (both of which he was president) on a book or report on undersea fiberoptic cable systems. (*Id.* ¶¶ 2, 7.)

At least nominally, Telematics was given wide latitude in fulfilling its contractual obligations:

> Subject to the terms of this Agreement, CONSULTANT shall remain free to determine the manner in which it shall perform its services under this Agreement.

> \* \* \* \* \* \*

> [NNS] representatives shall exercise no supervisory control or guidance of CONSULTANT but shall be available for consultation and advice.

(*Id.* ¶ 14.) However, the Agreement also named "representative[s] for authorizing WORK to be performed," (*id.* ¶ 28), and stated that "CONSULTANT is engaged solely to provide professional consulting services and ... all actions and decision related to the implementation or utilization of the WORK shall be solely the actions and decision of [NNS]," (*id.* ¶ 21). In addition, NNS had to authorize Tagare's marketing activities and reimbursed him only for "such marketing and business development activities which it has authorized." (*Id.*, Sched. 1, ¶ I(4), (5).)

Under the Agreement, Telematics also was free to determine which of its employees would carry out the agreed services, provided that it "acknowledge[] that Mr. Tagare's skill, time and energies are key to the success of the WORK under this Agreement" and consequently agree that Tagare would devote himself full-time to the FLAG Project. (*Id.* ¶ 14.) At the same time, however, the Agreement provided that NNS would provide Tagare with his sales and marketing team. (*Id.*, Sched. 1, ¶ I(2).)

In exchange for its services, Telematics was to be paid fees of $300,000 each year of the original or renewed contracts, payable in monthly installments of $25,000. (*Id.*, Sched. 2, ¶¶ 1, 5, 6.) In order to receive payment, Telematics was required to render an invoice to NNS "identify[ing] the amount chargeable to [NNS]." (*Id.* ¶ 4.)

The Agreement also called for payment of incidentals such as a stipend for apartment rental; up to three weeks of paid vacation; expenses (up to $10,000) "for two weeks of travel to any part of the world for Mr. & Mrs. Tagare"; reimbursement of tuition and other expenses related to an executive MBA program; reimbursement for reasonable out-of-pocket expenses (including travel, entertainment, and lodging); reasonable legal fees for Tagare's naturalization as a United States citizen; and "[r]eimbursement of medical insurance for Mr. & Mrs. Tagare." (*Id.*, Sched. 2.)

In addition, the Agreement outlined bonuses dependent upon the status of the FLAG Project and upon Telematics' sales performance. These bonuses increased Telematics' potential fee by as much as $2.3 million. (*Id.*, Sched. 2.) For purposes of this action, the most significant bonus was the capacity sales incentive, by which NNS would pay Telematics a bonus of $500,000 for $800 million in capacity sales, an additional $600,000 bonus for $1.0 billion in sales, and an additional $700,000 bonus for $1.2 billion in sales. The Agreement defined "sales" as "fully executed agreements." (*Id.*, Sched. 2, ¶ 16.)

With respect to its fees, Telematics expressly agreed "that it is liable for and will pay for federal, state, local or other governmental income tax, withholding tax, social security taxes, excise, sales or other service taxes and the like, or any other taxes relative to the compensation and expenses paid to CONSULTANT under this Agreement." (*Id.* ¶ 14.)

NNS could terminate the Agreement before the expiration of its term only "for cause," defined as a judicial finding of illegal activity on the part of Telematics, a judicial finding of the Agreement's unlawfulness, or the bankruptcy, liquidation, or insolvency of Telematics. (*Id.* ¶ 16.)

### B. *Employment Relationship*

Tagare contends that he was an "employee" within the meaning of Title VII and the NYSHRL; defendants assert that Tagare was an independent contractor to whom those statutes do not apply. As discussed below, the determination of Tagare's employment status involves a detailed, fact-intensive inquiry of several factors. Accordingly, to avoid repetition, the facts relevant to this inquiry will be set out below in Part II.A. of the Discussion rather than here.

### C. *Breach of the Agreement*

Tagare contends that NNS breached the Agreement by violating the implied covenant of good faith and fair dealing. In essence, he asserts that NNS interfered with his ability to earn the maximum bonus of $1.8 million under Schedule 2, ¶ 16 of the Agreement by (1) providing him with inadequate staffing, (2) restricting his travel, and (3) denying him necessary information.

## DISCUSSION

### I. *Summary Judgment Standard*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(d). A genuine issue for trial exists if, based on the record as a whole, a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all evidence must be viewed and all inferences must be drawn in the light most favorable to the non-moving party. *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 45 (2d Cir.1988).

The party seeking summary judgment bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter "it believes demonstrate[s] the absence of a genuine issue of

material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Upon the movant's satisfying that burden, the onus then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 250. At this stage, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990).

## II. *Title VII and Employment Status*

■ Title VII provides that it shall be unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment on the basis of, *inter alia,* the individual's national origin. 42 U.S.C. § 2000e–2(1). Title VII protects only "employees"; independent contractors may not obtain relief under the statute. *Stetka v. Hunt Real Estate Corp.,* 859 F.Supp. 661, 665 (W.D.N.Y.1994); *Krijn v. Simone,* 752 F.Supp. 102, 104 (S.D.N.Y.1990), *aff'd mem.,* 930 F.2d 910 (1991).

■ The United States Supreme Court has held that "where a statute containing the term 'employee' does not helpfully define it, the common law agency test should be applied." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322–23, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *see also O'Connor v. Davis,* 126 F.3d 112, 115 (2d Cir.1997). Because Title VII contains only a circular definition of "employee," *O'Connor,* 126 F.3d at 115; *Stetka,* 859 F.Supp. at 666, we look to common law agency principles to determine whether Tagare was an employee or independent contractor.

In *Community for Creative Non–Violence v. Reid,* the Supreme Court set out the following factors relevant to this inquiry:

(1) the tax treatment of the hired party;

(3) the skill required;

(4) the hiring party's right to control the manner and means by which the product is accomplished;

(5) whether the hiring party has the right to assign additional projects to the hired party;

(6) the source of the instrumentalities and tools;

(7) the location of the work;

(8) the duration of the relationship between the parties;

(9) the extent of the hired party's discretion over when and how long to work;

(10) the method of payment;

(11) the hired party's role in hiring and paying assistants;

(12) whether the work is part of the regular business of the hiring party; and

(13) whether the hiring party is a business.

490 U.S. 730, 751–52, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989). No one of these factors is determinative. *Id.* at 752.

Indeed, recognizing that not all factors are equally important or have relevance in every case, the Second Circuit has adopted a weighted approach in applying the *Reid* test. *Aymes v. Bonelli,* 980 F.2d 857, 861 (2d Cir.1992); *Langman Fabrics v. Samsung America, Inc.,* 967 F.Supp. 131, 133 (S.D.N.Y.1997). The *Aymes* Court identified the first five factors listed above as "factors that will be significant in virtually every situation." 980 F.2d at 861.

■ Additionally, although an individual's employment status is not determined solely by the label used in the hiring contract, *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 232 (2d Cir.1995),[3] courts within the

---

3. *See also Carter v. Helmsley–Spear, Inc.,* 71 F.3d 77, 87 (2d Cir.1995) (use of terms such as "em-

ploy" or "employment" in hiring contract "does not transform them into 'magic words' imbued

Second Circuit have considered contractual language as one factor among many in determining employment status. *See Tuohy v. Bally, Inc.*, No. 95–1499, 1997 WL 66784, at *4 (S.D.N.Y. Feb. 14, 1997); *O'Dell v. Eggensperger*, No. 95–3950, slip op. at 2, 1998 WL 29644 (S.D.N.Y. Dec. 13, 1996); *Frankel v. Bally*, No. 90–0815, 1994 WL 409461, at *1 (S.D.N.Y. Apr. 11, 1994).

■ Finally, the determination of whether a plaintiff is an employee or an independent contractor is a question of law, while the existence and degree of the legal factors to be considered in this determination are questions of fact. *Stetka*, 859 F.Supp. at 665 (citing *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir.1988)).

## A. Application of Reid/Aymes Factors

### 1. Tax Treatment

■ The parties' tax treatment of the employment relationship is highly indicative, and may even constitute a "virtual admission," of the hired party's status. *Aymes*, 980 F.2d at 862. This factor is extremely important in the instant case.

To begin with, NNS's tax treatment of Tagare clearly demonstrates that it considered him to be an independent contractor. NNS provided Telematics with an IRS Form 1099 (for non-employee compensation) rather than providing Tagare with a W–2 Form. (Pl. Dep. at 187; Schmelkin Decl. Exh. A(10).) In addition, in accordance with ¶ 14 of the Agreement, no income, social security, payroll, or other taxes were deducted or withheld from NNS's payments to Telematics/Tagare. This is a strong indication that Tagare was an independent contractor. *See Aymes*, 980 F.2d at 859, 862 (failure of hiring party to pay payroll taxes or withhold income taxes

was "highly indicative that [hired party] was considered an outside independent contractor"); *accord Langman Fabrics*, 967 F.Supp. at 134; *Graham v. James*, No. 91–0800E, 1996 WL 484369, at *10 (W.D.N.Y. Aug.15, 1996).

Even more importantly, Tagare consistently represented to tax authorities that he was not an employee of any defendant and received substantial financial benefits from his self-proclaimed employment status. In his federal and state tax returns from 1993–1995, Tagare portrayed himself as an independent consultant deriving income from his independent business rather than receiving wages from an employer. As a result, Tagare was able to deduct substantial sums from his taxable income. (*See* Schmelkin Decl. Exhs. B–D.)[4]

We find that Tagare's representations to tax authorities constitute a "virtual admission" of his status as an independent contractor. *See Aymes*, 980 F.2d at 862–64 (hiring party's tax treatment of plaintiff constituted "virtual admission" of plaintiff's status; "we attach [significant weight to hiring party's] choice to treat [hired party] as an independent contractor when it was to [hiring party's] financial benefit. Now that this treatment is no longer to [hiring party's] benefit, [it] must still adhere to the choice it made."); *O'Dell*, slip op. at 3 (hired party's conduct was "virtual admission" of her status as independent contractor where, for up to ten months after commencing her Title VII action, she represented her independent status in tax returns and "took advantage of the tax benefits and advantages afforded to independent contractors"; hiring party also did not withhold taxes or pay payroll taxes or social security on her behalf).[5] The balance of the remaining factors supports this conclusion.

with legally controlling significance"), *cert. denied*, 517 U.S. 1208, 116 S.Ct. 1824, 134 L.Ed.2d 930 (1996); *In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir.1984) (under agency principles, an "employee does not become an independent contractor simply because a contract describes him as such").

**4.** Additionally, in a November 1993 application for a home mortgage, Tagare represented to the Chase Manhattan Bank that he was "self-employed" as "principal" of Telematics, a "telecom-

munications consulting" business. (Schmelkin Decl. Exh. A(32); Pl. Dep. at 794–97.)

**5.** *See also Carter*, 71 F.3d at 86 (hiring party's tax treatment of plaintiffs "weigh[ed] strongly" in determining their employment status); *Langman Fabrics*, 967 F.Supp. at 134 (same); *Graham*, 1996 WL 484369, at *10 (same); *Frankel*, 1994 WL 409461, at *1–2 (both plaintiff's and hiring party's tax treatment of plaintiff were important in determining his employment status).

### 2. *Employee Benefits*

Tagare did not receive any of the regular benefits provided to defendants' employees. He was not enrolled, and could not enroll, in any of defendants' health care, life, pension, or disability plans. (Rooney Decl. ¶ 3; Pl. Dep. at 194.)

None of the various perquisites that Tagare cites as evidence of his employee status was a regular benefit to which other employees were entitled. To begin with, the private medical insurance policy that Tagare had was not part of the regular company benefits. Rather, it was a benefit individually negotiated in the Agreement. Pursuant to Schedule 2 of the Agreement, Tagare bought his own policy and received reimbursement from NNS. (Pl. Exh. 3, Schedule 2, ¶¶ 5, 6, 9; Rooney Decl. ¶ 4 & Exh. A.) He also made deductions for this "self-employed health insurance" on his tax returns. (Schmelkin Decl. Exhs. B–D.)

In addition, the "per diem" of $100 per week (or $20 per day for partial weeks) that Tagare received from NNS(B) differed in nature and amount from the allowances received by NNS(B) employees. NNS(B) employees receive a per diem of $95 per weekday and $200 per weekend day spent in Bermuda on business. The amount is paid automatically, regardless of the employees' actual expenditures. (Parry Decl. ¶ 5.) By contrast, Tagare's $20–per–day "per diem"—authorized only after negotiation—was based on his actual expenditures. (*Id.* ¶ 6 & Exh. B.)

Similarly, Tagare's vacation time, reimbursement for travel with his wife, reimbursement for his tuition and expenses at Harvard Business School, and monthly apartment rental allowance were individually negotiated items in the Agreement and were not part of the regular benefits available to defendants' employees.

That Tagare did not receive any regular employee benefits is highly probative of his status as an independent contractor.

### 3. *Control of Manner and Means*

Despite provisions in the Agreement that Telematics would "remain free to determine the manner in which it shall perform its services" and that NNS "representatives shall exercise no supervisory control or guidance," (Pl.Exh. 3, ¶ 14), defendants Parry, Reda, and Yackanich appear to have possessed ultimate authority over many of Tagare's actions. Although Tagare had broad responsibilities and authority with respect to his marketing functions, he was ultimately constrained by NNS's budget and, in some instances, content preferences. (*See, e.g.,* Reda Dep. at 30–32, 37–38, 89–95, 99–100; Yackanich Dep. at 40–41, 44–47.)

■ However, a supervisory relationship is not necessarily inconsistent with independent contractor status. *See O'Dell,* slip op. at 2 ("That plaintiff occasionally met with . . . managers to discuss her strategies and that these managers discussed and sometimes made changes to her plans does not convert plaintiff's relationship with [hiring party] into one of employment, since such conduct is fully consistent with an independent contractor relationship."); *see also Tuohy,* 1997 WL 66784, at *4 (although hiring party "maintained significant control over many facets of the manner in which [the hired parties] sold [its] products, [the hired parties] still exercised a great degree of independence in the manner and means by which they sold those products"). Moreover, the Supreme Court and most courts within the Second Circuit that have addressed this factor emphasize the extent of the hiring party's control over the hired party's *daily* activities. *See Reid,* 490 U.S. at 752 (hired party was independent contractor where, *inter alia,* "*daily* supervision of his activities [was] practically impossible" because he worked in his own apartment in a different city, despite the fact that hiring party "directed enough of [hired party's] work to ensure that he produced a sculpture that met their specifications") (emphasis added); *Stetka,* 859 F.Supp. at 667 (hired party was independent contractor where, *inter alia,* hiring party "did not exercise *day-to-day* control over [hired party] such as an employer would exercise over an employee") (emphasis added); *Breen v. Hunt Real Estate Corp.,* No. 91–582A, 1994 WL 417017, at *6 (W.D.N.Y. July 29, 1994) (same); *Frankel,* 1994 WL 409461, at *1 (hired party was

independent contractor where, *inter alia*, hired party was not required to "report on a *daily* basis") (emphasis added); *Krijn*, 752 F.Supp. at 104 (hired party was independent contractor where, *inter alia*, her "supervisor" did not "exercise any meaningful control over [her] hours or over the *day-to-day* details of her work") (emphasis added). Tagare has provided no evidence of anything approximating daily supervision. On the contrary, Tagare possessed significant discretion over when, where, and how long to work. Consideration of this related *Reid/Aymes* factor indicates that Tagare had greater autonomy than a regular employee.

On balance, we find that although defendants exercised some control over the details of Tagare's work, Tagare possessed substantially more authority and independence than a traditional employee. This factor, then, is inconclusive. *Cf. Reid*, 490 U.S. at 752 (although hiring party exercised some control over hired party's work product, "the extent of control the hiring party exercises over the details of the product is not dispositive"); *Langman Fabrics*, 967 F.Supp. at 134 (same).

### 4. *Right to Assign Additional Projects*

Tagare has provided no evidence that he was assigned work beyond the scope of the Agreement. The Agreement called for Tagare to perform marketing, business development, and sales activities on the FLAG Project. (*See* Pl. Exh. 3, p. 1 & Sched. 1, ¶ I(1)-(4).) Although Tagare "was called upon to provide a variety of tasks," (Pl. Br. at 29), these tasks were well within the scope of work contemplated by the Agreement. Accordingly, this factor weighs in favor of independent contractor status. However, because the very nature of Tagare's duties with respect to the FLAG Project was broad, the fact that he was not assigned additional tasks beyond those duties does not weigh compellingly against him.

### 5. *Skill*

It is undisputed that Tagare was hired for his specialized skills and thus that this factor weighs in favor of independent contractor status. (*See* Pl. Br. at 28 n. 1.)

We pause here to note that the five foremost factors in the *Reid/Aymes* analysis weigh virtually conclusively in favor of independent contractor status. The following analysis of the remaining factors confirms this conclusion.

### 6. *Source of Instrumentalities*

Tagare appears to have been provided, at least for a time, with offices at both NNS and NNS(B). He was provided with a secretary and used the office equipment (*e.g.*, phone, computer, etc.). (*See* Pl. Dep. at 175–76, 200–05, 717–18; Yackanich Dep. at 80; Parry Dep. at 37–40; Gill Dep. at 22–23; Simons Dep. at 27–29.) However, he was out of the office (either working at home or traveling) much of the time. And again, Tagare's tax returns are telling: he gave his home address as his business address on his tax returns; he deducted thousands of dollars in telephone charges and "supplies" from his taxable income; and he took depreciation deductions for "office equipment." (Schmelkin Decl. Exhs. B–D.) *Cf. Frankel*, 1994 WL 409461, at *2 (hired party was independent contractor where, *inter alia*, he "depreciated assets used in his business, and took tax deductions for business-related expenses such as ... office-related expenses"). Despite drawing all reasonable inferences in Tagare's favor, this factor is at best (from his point of view) inconclusive.

### 7. *Duration of Relationship*

Tagare entered into four contracts with NNS of either six-month or one-year durations; the final contract was renewed for two additional years. The year-by-year nature of this contractual relationship reflects the uncertainty surrounding the duration of the FLAG Project. For example, the Agreement contemplated the potential termination of the project, in the event of which Telematics would have received a $500,000 termination fee. (Pl.Exh. 3, Sched.2, ¶ 3.) Similarly, the second contract provided that if $1 billion worth of commitments were not obtained by a certain point, Tagare would recommend whether the project should be terminated. (Schmelkin Decl. Exh. 8, Sched. I, ¶ 9.) Thus, although the parties' relation-

ship extended for a few years, the contracts appear to have contemplated a relationship of limited duration. This factor, then, does not point strongly in either direction.

### 8. *Hired Party's Role in Hiring/Paying Assistants*

The Agreement stated that NNS would provide Tagare with his sales and marketing team. (Pl. Exh. 3, Schedule 1, ¶ I(2).) Tagare nearly refused to sign the Agreement out of concern—based in part on this provision—that he would not be able to hire a qualified staff. (Pl. Dep. at 621–23.) Although Tagare received oral assurances that he would have full authority to hire and fire assistants, (*id.* at 614–15, 621–23), it appears that in practice defendants had to approve the hiring of any additional staff members, (Reda Dep. at 70–71; Pl. Dep. at 743). In this respect, Tagare's status resembles that of an employee. *See Carter*, 71 F.3d at 87 ("the fact that the [hired parties] could not hire paid assistants without the defendants' approval .... point[s] towards an employer-employee relationship").

### 9. *Method of Payment*

Under the Agreement, Telematics received a $300,000 consultant fee payable in monthly installments, as well as certain bonuses. Although he was paid monthly, Tagare received payments only after submitting invoices on Telematics letterhead, and those payments were paid by check made out to Telematics or by wire transfer to a Telematics bank account. (Pl. Dep. at 60, 192.) This practice—which "indicate[s] installment payments under the [A]greement, rather than 'monthly' paychecks," *Graham*, 1996 WL 484369, at *10—suggests an independent contractor relationship.

### 10. *Whether Work is Part of Regular Business*

The purpose of this factor is to determine whether the hired party is performing tasks that directly relate to the objective of the hiring party's business. *Aymes*, 980 F.2d at 863. The *Aymes* Court noted that "this factor will generally be of little use" and "carries very little weight." *Id.* Perhaps for this reason, courts rarely even address this factor. Therefore, although Tagare's work appears to have been directly related to the business objectives of at least some defendants, this factor is not strongly indicative of his employment status.

### 11. *Additional Considerations*

Consideration of additional facts supports the conclusion that Tagare was an independent contractor. First, the Agreement explicitly and unequivocally expressed the parties' intent to create an independent contractor relationship. (*See* Pl. Exh. 3, ¶¶ 14, 21.) Moreover, Tagare signed the Agreement only after conferring with his own attorney. (Pl. Dep. at 40, 615–20, 623–24.) Second, defendants issued Tagare a non-employee ID. (Schmelkin Decl. Exh. 11 .) Third, NNS could terminate the Agreement—and thus fire Tagare—only "for cause," defined as (1) a judicial finding that Telematics engaged in illegal, criminal, or fraudulent conduct; (2) Telematics' bankruptcy, liquidation, or insolvency; or (3) a judicial finding that the Agreement is unlawful. (Berg Aff., Exh. 3, ¶ 16.) Few, if any, employees enjoy such job security.

On the other hand, aside from a provision in the Agreement allowing Tagare to work with his two companies, Telematics and Overseas Communication Corporation, on a book or report on undersea fiberoptic cable systems, the Agreement required Tagare to work exclusively for NNS on the FLAG Project. (*Id.* ¶¶ 2, 7.) This arrangement weighs in favor of employee status. *See Carter*, 71 F.3d at 87.

Finally, several facts relied on by Tagare are not highly probative of his employment status. In particular, NNS's representations to the consulates in Italy and Vietnam that Tagare "is an employee of our company," (Berg Aff., Exhs. 9, 10), weigh in his favor, if at all, only slightly. Similarly, that Tagare sent correspondence on FLAG and NNS stationery and was provided with FLAG and NNS(B) business cards carry little, if any, weight. (Berg Aff., Exhs. 12, 17.)

### B. *Tagare was an Independent Contractor*

The undisputed facts overwhelmingly indicate that Tagare was an independent contractor, rather than an employee of any defendant. Accordingly, his Title VII claims are dismissed.

### III. *NYSHRL and Employment Status*

Like Title VII, the NYSHRL's proscriptions against unlawful employment discrimination apply solely to employees and not to independent contractors. *Scott v. Massachusetts Mut. Life Ins. Co.*, 86 N.Y.2d 429, 633 N.Y.S.2d 754, 756, 657 N.E.2d 769, 771 (Ct.App.1995). Under the NYSHRL, a hired party's status is determined by whether "a traditional employment relationship" exists. *Id.* This determination focuses on the degree of the hiring party's "control over the results produced or over the means used to achieve the results." *Id.* Moreover, "[m]inimal or incidental control over one's work product without the employer's direct supervision or input over the means used to complete it is insufficient to establish a traditional employment relationship." *Id.*

The factors consulted in this analysis largely mirror those weighed in Title VII claims. *See id.; In re Ted Is Back Corp.*, 64 N.Y.2d 725, 485 N.Y.S.2d 742, 744, 475 N.E.2d 113, 115 (Ct.App.1984); *Mehtani v. New York Life Ins. Co.*, 537 N.Y.S.2d 800, 802–03, 145 A.D.2d 90, 93–94 (1st Dep't 1989); *cf. In re Villa Maria Inst. of Music v. Ross*, 54 N.Y.2d 691, 442 N.Y.S.2d 972, 973, 426 N.E.2d 466, 467 (Ct.App.1981) ("All aspects of the arrangement must be examined to determine whether the degree of control and direction reserved to the employer establishes an employment relationship.")

Therefore, for the same reasons as those discussed above in Part II.A., summary judgment is granted with respect to Tagare's NYSHRL claims.

### IV. *Breach of Contract Claim*

Under New York law, every contract contains an implied covenant of good faith and fair dealing. "This covenant includes 'an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.'" *Carvel Corp. v. Diversified Mgmt. Group, Inc.*, 930 F.2d 228, 230 (2d Cir.1991) (quoting *Grad v. Roberts*, 14 N.Y.2d 70, 248 N.Y.S.2d 633, 637, 198 N.E.2d 26, 28 (Ct.App. 1964)); *see also Kader v. Paper Software, Inc.*, 111 F.3d 337, 342 (2d Cir.1997); *Tagare*, 921 F.Supp. at 1150; *Wieder v. Skala*, 80 N.Y.2d 628, 593 N.Y.S.2d 752, 756, 609 N.E.2d 105, 109 (Ct.App.1992). Where the contract contemplates the exercise of discretion, this implied covenant "includes a promise not to act arbitrarily or irrationally in exercising that discretion." *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 639 N.Y.S.2d 977, 979, 663 N.E.2d 289, 291 (Ct. App.1995). That said, no obligation can be implied that would be inconsistent with explicit, bargained-for contractual terms. *Patterson v. Bowie*, 237 A.D.2d 184, 654 N.Y.S.2d 769, 771 (1st Dept.1997); *Dalton*, 639 N.Y.S.2d at 979–80, 663 N.E.2d at 291–92.

Tagare contends that NNS—through the actions of NNS/NNS(B) executives Parry, Reda, Yackanich, and Timpanaro—violated the Agreement's implied covenant of good faith and fair dealing by interfering with his ability to earn the maximum bonus of $1.8 million under Schedule 2, ¶ 16 of the Agreement (the only item of compensation that Tagare did not receive under the Agreement). In particular, he claims that NNS (1) provided him with inadequate staffing, (2) restricted his travel, and (3) denied him necessary information such that he was unable to secure capacity sales sufficient to trigger the bonus. We find, however, that Tagare has produced no evidence that NNS intentionally or arbitrarily interfered with his ability to reach the bonus sales target.

First, Tagare contends that the staff NNS provided him with for the FLAG Project was inadequate in terms of both quantity and quality. In addition to asserting that he was provided with an insufficient number of assistants, Tagare complains of being forbidden to hire employees with experience in international submarine cable capacity marketing

and instead being forced to accept an inexperienced, untrained, and incompetent staff. (Pl. Dep. at 132–36, 173–83, 588–90, 689–90; Pl. Br. at 20–21, 23, 36–37.) Tagare asserts not only that he lacked staff sufficient to help him reach the sales target, but that the inadequacy of the staff forced him to devote time to training his assistants rather than developing business. (Pl. Br. at 20.) He also states that his repeated complaints to Timpanaro and Yackanich that his staff was unqualified, and that as a result sales and marketing were being negatively affected, were ignored. (Pl. Br. at 21–22; Pl. Dep. at 371–73, 843–47.)

Second, Tagare contends that his authority was diminished after Parry was named President of NNS(B), and that those in the new NNS hierarchy restricted his travel and business opportunities. (Pl. Br. at 18–19, 37; Pl. Dep. at 143–48, 151–52, 376.)

Third, he asserts that NNS denied him necessary information by ceasing to give him confidential information on the FLAG Project or copy him on memoranda and by excluding him from meetings and conference calls. (Pl. Br. at 22; Pl. Dep. at 374–76.)

These contentions fail for several reasons. To begin with, the Agreement specifically gave NNS the right to provide Tagare's sales and marketing team. (Pl.Exh. 3, Sched.1, ¶ I(2).) Further, the five-person FLAG management team that he complains of, (see Pl. Br. at 20), was in place before Tagare signed the Agreement. (Pl. Dep. at 589–90.) Similarly, his objection to having had to train an undermanned and unqualified staff largely fails because much of this complaint relates to instances predating the Agreement. (See Pl. Dep. at 175–76, 700, 717.) Tagare cannot now complain of conditions to which he acquiesced by signing the Agreement.

In addition, nothing in the Agreement prohibited the conduct Tagare complains of; in fact, it appears to have authorized much of it. For example, the Agreement provided that Yackanich, Reda, or "such other representative as [NNS] determines" would authorize the work to be performed under the Agreement. (Id. ¶ 28.) Also, the Agreement specifically stated that Tagare would conduct marketing activities "as authorized by [NNS]," and that NNS would be responsible only for "expenses associated with such marketing and business development activities which it has approved and authorized." (Id., Sched. 1, ¶ I(4), (5).) Further, the Agreement specified that Tagare would be a vice president, not the president, of NNS/NNS(B). (Pl.Exh. 3, Sched.1, ¶ I(1).)

Above all, Tagare has provided no evidence that NNS "intentionally and purposely" prevented him from achieving the bonus sales target, Carvel, 930 F.2d at 230, or that it "arbitrarily or irrationally" exercised the discretion it had over work, travel, and expense authorizations, Dalton, 639 N.Y.S.2d at 979, 663 N.E.2d at 291. On the contrary, in his deposition Tagare repeatedly stated that NNS did not intentionally suppress capacity sales and had no incentive to do so. (Pl. Dep. at 687–91, 873–75, 913, 924, 949–50, 963, 968.) Rather, as the cause of his failure to reach the bonus target, Tagare pointed to NNS's "not understanding the industry, and not being smart enough to know that they don't understand the industry." (Pl. Dep. at 688.) Tagare stated:

> ... they did not have the right people. They did not have the proper training programs. They did not have people who understood the pricing of submarine cables .... They did not have people experienced in the strategy portion of the business. Did not have people with contacts in the industry, like other companies do. Not understanding the nature of FLAG and how [it] differs from other submarine cables. All of these things put together were the cause of having missed the sales.

(Pl. Dep at 689–90.)

Effectively in the same breath, however, Tagare stated that he believed that NNS intentionally underbudgeted the marketing department to spite him and drive him off the FLAG Project. (Pl. Dep. at 691.) Aside from conflicting with other portions of his deposition, the problems with this assertion are that Tagare presents little or no evidence to support it and that, as Tagare acknowledged, there would be no reason for NNS to undermine its own interests by sabotaging his sales efforts. Nevertheless, Tagare con-

tends in his brief—in contradiction to his deposition testimony—that NNS did have a financial incentive not to promote the FLAG Project:

> ... the project is not scheduled to go on line until [the] fourth quarter of 1997. Accordingly, the only beneficiary of early CSAs [capacity sales agreements] would be Plaintiff. Thus, defendant saved money by not signing CSAs early because it did not have to pay Plaintiff.

(Pl. Br. at 37.)

Its speculative nature aside, this contention is illogical and contrary to the evidence. In order for Tagare's $1.8 million bonus to kick in, NNS(B) would have had to reach $1.2 billion in executed CSAs. (Pl.Exh. 3, Sched.2, ¶ 16.) Based on its arrangement with FLAG, NNS(B)'s commission on such sales (which were NNS(B)'s only significant source of revenue) would have been at least $36 million. · (Parry Decl. ¶¶ 14, 16.) Thus, NNS and NNS(B) had abundant incentive not to suppress capacity sales.

Nor did NNS and NNS(B) stand to gain financially by delaying the execution of CSAs (until after July 31, 1996, when the Agreement by its terms terminated), as Tagare suggests in his brief. To begin with, Tagare's bonus would have represented only 5% of the $36 million that NNS(B) would have earned on such sales. As Parry points out, "[w]ith the prime rate hovering at or above 8% in recent years it would have been economically absurd to delay sales of that magnitude for any appreciable length of time, even assuming NNS(B) could guarantee that the same sales would be available at a later date." (Id. ¶ 17.) Further, in light of Tagare's "capacity on demand" marketing strategy and the competition that developed with another submarine cable, (id. ¶¶ 17, 19), there was no way to guarantee that the sales opportunities would remain.

In sum, Tagare has failed to provide evidence from which a reasonable trier of fact could conclude that NNS violated the implied covenant of good faith and faith dealing by intentionally or arbitrarily interfering with his marketing and sales efforts. Accordingly, summary judgment is granted with respect to Tagare's breach of contract claim.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment is granted with respect to all claims and the Complaint is dismissed in its entirety. An appropriate judgment shall be entered by the Clerk of the Court.

SO ORDERED.