**Debrah SOWEMIMO, Plaintiff,**

v.

**D.A.O.R. SECURITY, INC. and Carlos Cabreja, Mohammed Islam, Mary Barbieri also known as Leandra Barbieri, and the New York City Department of Homeless Shelters, Individually, and as Aiders and Abettors, Defendants.**

**No. 97 CIV. 1083 RLC.**

United States District Court,
S.D. New York.

April 19, 1999.

Anthony C. Ofodile, Brooklyn, NY, Anthony C. Ofodile, Of Counsel, for Plaintiffs.

Michael D. Hess, Corporation Counsel of the City of New York, New York, NY, Eva L. Martinez, Of Counsel, for Defendants.

Nicoletti, Gonson & Bielat, LLP, New York, NY, Jesse R. Dunbar, Of Counsel, for Defendants.

## OPINION

ROBERT L. CARTER, District Judge.

Defendants D.A.O.R. Security, Inc., Mohammed Islam, the New York City Department of Homeless Services and Leandra Barbieri move for summary judgment pursuant to Rule 56, F.R. Civ. P. to dismiss the complaint of plaintiff Debrah Sowemimo. Plaintiff's complaint against defendants alleges employment discrimination based on sexual harassment and retaliatory discharge under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law § 290 et seq. (the "HRL") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–107 (the "NYCHRL"); racial discrimination pursuant to Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 ("Section 1981"); and, negligence and intentional torts under New York law. In addition to these claims, plaintiff has also moved for leave to amend her complaint pursuant to Rule 15(a), F.R. Civ. P.

### Facts

Plaintiff Debrah Sowemimo ("Sowemimo") is a woman of Nigerian national origin who was employed by defendant D.A.O.R. Security, Inc. ("D.A.O.R.") from February 1995 until October 12, 1995. Plaintiff was assigned by D.A.O.R. to work as a security guard at DHS's Park Avenue Women's Shelter. Defendants in this case include D.A.O.R., a private firm that provides security services to clients; the New York City Department of Homeless Services ("DHS"), which operated the Park Avenue Women's Shelter and utilized D.A.O.R. services; Mohammed Islam ("Islam"), Sowemimo's immediate D.A.O.R. supervisor at the Park Avenue site, and Leandra Barbieri ("Barbieri"), the Deputy Director of the Park Avenue Women's Shelter during the period of plaintiff's employment.[1] Reading the available evidence

---

1. By stipulation of the parties, plaintiff's claims against Carlos Cabreja have been

in the light most favorable to the plaintiff, the following events form the basis of plaintiff's complaint.

Sowemimo alleges that on more than one occasion during the period of February, 1995 through August, 1995, Mr. Islam made comments to her about her physical anatomy and the physical anatomy of other female employees (Sowemimo Dep. at 268), and propositioned her for dates and for sex (Sowemimo Dep. at 262–67). Sowemimo consistently rebuffed Islam's advances.

In August, 1995, Sowemimo was stationed in the basement of the shelter. According to her account, Islam visited her at about 2:00 AM and began to proposition her for a date as he had done before. Sowemimo refused, stating that she was married. According to Sowemimo, Islam responded, "It doesn't matter," to which she replied, "It matters to me." Islam persisted, and after continuing his propositions, Islam allegedly grabbed Sowemimo's breast while uttering sexual vulgarities. Sowemimo retaliated by slapping Islam on the face. She told Islam that his advances were unacceptable, and that if it continued she would press charges against him. According to Sowemimo, Islam said that no one would believe her story because there were no witnesses and he would not be perceived as the kind of person to commit a sexual offense.

Sowemimo claims that shortly after this incident she visited D.A.O.R.'s main office in the Bronx, New York and reported to George Burret and Carlos Cabreja, D.A.O.R. officials, that she was being sexually harassed. Sowemimo stated in her deposition that she decided to report Islam because she considered Islam's physical assault more "serious" than his prior advances. Sowemimo informed Burret and Cabreja that Islam had initiated sexual discussions with her on more than one occasion, that Islam had grabbed her breast, and that she had slapped him. She asked to see the owner of the company,

dropped.

but was refused. According to Sowemimo, Burret and Cabreja informed her that they would convene a meeting to include both Sowemimo and Islam, but a date for a meeting was not set.

Sowemimo also describes an incident from the summer of 1995 involving Barbieri. Sowemimo alleges that she was instructed by Barbieri to prop open exit doors on the fifth floor to ameliorate the effect of an ongoing heat wave. Sowemimo refused, citing D.A.O.R.'s strict policy against propping open exit doors. According to Sowemimo's account, Barbieri called her a "black nigger" for refusing to follow Barbieri's instructions and threatened to have Sowemimo barred from working in City-run shelters.

On September 12, 1995, Sowemimo was again posted on the fifth floor of the shelter. She claims that she was called on her radio several times by Islam and responded each time, and that her replies were overheard by Isoken Erhunmwunse, another D.A.O.R. security guard. Sometime later Sowemimo and Islam became engaged in an argument near Islam's desk on the third floor. The parties' accounts of what follow differ markedly. According to Sowemimo, Islam indicated that he was going to file a disciplinary report against her for failing to respond to his radio calls and for previously arguing with Barbieri. Sowemimo, believing that Islam was about to deliberately file a false report, grabbed the disciplinary form that was on Islam's desk. She states that Islam then punched her on the breast, and that each of the two grasped the other's shirt and yelled until additional security guards arrived to separate them. Islam maintains that Sowemimo never responded to his radio calls, left her post without authorization, and viciously attacked him without provocation by striking him with her radio and threatening to kill him.

Immediately following the altercation, Islam submitted a disciplinary form to

D.A.O.R. describing Sowemimo as a dangerous employee, and Sowemimo was removed from the Park Street Women's Shelter pending an investigation by D.A.O.R. into the fighting incident.

Pursuant to its investigation, D.A.O.R. collected and reviewed statements of employees on duty at the time of the altercation. Although Barbieri was not at the shelter on September 12, 1995, D.A.O.R. also requested a report from Barbieri about the incident. Barbieri submitted a short statement consisting of accounts gleaned from other employees and recommended that Sowemimo not be assigned to any DHS facility. Sowemimo also submitted a statement describing the altercation as part of an ongoing pattern of sexual harassment. About a month after suspending Sowemimo, D.A.O.R.'s personnel manager Stephen Worrell ("Worrell") called Sowemimo to D.A.O.R. offices on October 12, 1995 and terminated her employment.

## I. Plaintiff's motion for leave to amend her complaint

■ Pursuant to Rule 15(a), F.R. Civ. P., plaintiff moves to add to her complaint a claim under 42 U.S.C. § 1983 and a further factual basis for her retaliation claim. While leave to amend shall be freely given when justice so requires, it is within the court's discretion to refuse to grant leave for among other reasons, undue delay and unfair prejudice. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962).

Perhaps the most common reason for denying leave to amend is that a change in pleadings will prejudice the opposing party. *See generally* 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane Federal Practice & Procedure: Civil 2d §§ 1487–88. "Prejudice may be found, for example, when the amendment is sought after discovery has been closed... Undue delay and bad faith ... are other reasons for denying a motion to amend." *Berman v. Parco*, 986 F.Supp. 195, 217 (S.D.N.Y.

1997) (Wood, J.) (adopting magistrate's recommendation to deny leave to amend) (citation omitted). Plaintiff sought leave to amend after the close of discovery and after defendants moved for summary judgment. Granting plaintiff's motion for leave to amend her complaint at such a late point in the proceedings would prejudice defendants, and plaintiffs motion is therefore denied. Accordingly, the court limits its consideration to the substance of plaintiff's original complaint.

## II. Standard for Summary Judgment

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), F.R. Civ. P. The moving party has the burden to demonstrate that no genuine issue respecting any material fact exists, and all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought. *Tomka v. Seiler*, 66 F.3d 1295, 1304 (2d Cir.1995); *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1223–24 (2d Cir.1994). On summary judgment, the trial court can not try issues of fact; it can only determine whether any genuine issues of material fact exist to be tried. *Tomka*, 66 F.3d at 1304. "[T]he substantive law will identify which facts are material ... [and][o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In a discrimination case, a trial court must be cautious about granting summary judgment to an employer when the employer's intent is at issue. Because "smoking gun" evidence of discrimination is rarely available, affidavits and depositions must be carefully scrutinized for circum-

stantial proof which, if believed, would show discrimination. *Gallo*, 22 F.3d at 1224; *Ponticelli v. Zurich American Insurance Group*, 16 F.Supp.2d 414, 425 (S.D.N.Y.1998) (Sweet, J.).

### III. Plaintiff's claim against D.A.O.R. and Islam for sexual harassment

■ Under Title VII of the Civil Rights Act of 1964, "[i]t shall be an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII reaches conduct that "requires people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). At least as far as determining whether objectionable actions constitute actionable sexual harassment, claims made under the New York State Human Rights Law ("HRL") and the New York City Human Rights Law ("NYCHRL") are similar to those made under Title VII, and can be examined identically for summary judgment purposes. *See Ponticelli*, 16 F.Supp.2d at 432; *see also Mohamed v. Marriott Int'l*, 905 F.Supp. 141, 157 (S.D.N.Y.1995) (Sweet, J.) ("The wording of the city ordinance and the manner in which it has been applied show a clear intent to parallel the obligations and the remedies provided by the State of New York and the United States").

■ In a "hostile work environment" claim such as this one, conduct is actionable when it is so "severe or pervasive" as to "alter the conditions of employment and create an abusive working environment." *See Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citations omitted). The conduct in question must be both objectively and subjectively offensive, some-

thing that a reasonable person would find hostile or abusive, and something that the victim did in fact perceive to be so. *See id.* at 67, 106 S.Ct. 2399. The Second Circuit has held that objectionable incidents must be more than episodic; they must be "sufficiently continuous and concerted" in order to be deemed pervasive. *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir.1997) (citations omitted). However, "even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir.1998) (citing *Tomka*, 66 F.3d at 1305). To decide whether a hostile work environment exists, a finder of fact must consider the totality of the circumstances which may include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 62 (2d Cir.1998) (citations omitted). In general, the question of whether acts create a hostile work environment is usually best left to the trier of fact. *See Ponticelli*, 16 F.Supp.2d at 429 ("[e]valuating the severity and pervasiveness of a harasser's conduct on summary judgment is neither easy nor, in many cases, appropriate") (citation omitted).

■ Sowemimo's allegations that she was verbally harassed over a period of months and physically harassed on two occasions by her supervisor Islam are sufficient to create an issue of fact as to whether Sowemimo endured a hostile work environment. Sowemimo stated that she considered the incidents of physical groping to be more "serious" than Islam's verbal propositions, and the law similarly deems unwanted touching to be a highly significant factor contributing to a hostile work environment. A reasonable jury

could find that Islam's alleged conduct constituted actionable sexual harassment.

A plaintiff must also establish grounds for imputing the conduct that created the hostile environment to the employer. Two recent decisions by the United States Supreme Court, *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), have reshaped the standards for determining employer liability under Title VII in sexual harassment cases. Prior to *Faragher* and *Ellerth*, the standard for employer liability (as well as the standard for determining whether conduct rises to actionable sexual harassment) were substantially the same under Title VII as under the HRL and the NYCHRL, and New York courts have not yet demonstrated that they will follow the new *Faragher/Ellerth* standard regarding employer liability. Defendants liability under plaintiff's Title VII claim will therefore be analyzed according to the new standard, while liability under plaintiff's HRL and NYCHRL claims will be analyzed under pre-*Faragher/Ellerth* law. *See Ponticelli*, 16 F.Supp.2d at 432–33 (applying pre-*Faragher/Ellerth* law to New York state claims); *Seepersad v. D.A.O.R. Security, Inc.*, 1998 WL 474205, at *4 (S.D.N.Y. Aug.12, 1998) (Sotomayor, J.) (same).[2]

1. D.A.O.R. liability under Title VII

The United States Supreme Court recently described the standard for employer liability under Title VII as follows:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or suc-

cessively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, 118 S.Ct. at 2292–93; *Ellerth*, 118 S.Ct. at 2270.

Islam was Sowemimo's immediate supervisor, and thus D.A.O.R. is presumptively liable under Title VII for his acts of harassment. *See Quinn*, 159 F.3d at 767. Framing D.A.O.R.'s argument as an affirmative defense according to the *Faragher/Ellerth* standard, D.A.O.R. asserts that it had a clear anti-harassment policy and an established complaint procedure to prevent and correct any sexual harassment, but that Sowemimo never made any allegations of sexual harassment. D.A.O.R. points to a written statement made by Sowemimo during the early morning of September 12, 1995, following the physical altercation between her and Islam, in which Sowemimo describes the circumstances leading to the altercation. Sowemimo claims that Islam indicated that he was going to file a disciplinary report against her, a report that Sowemimo considered a sham motivated by Islam's anger at being rebuffed. (*See* Dunbar Aff. Ex. N.) Attempting to prevent Islam from writing the report, Sowemimo assured Is-

---

**2.** All but the defendants' reply memoranda (which also applied the prior standard) were submitted before *Faragher* and *Ellerth* were handed down, and apply the pre-*Faragher/Ellerth* standard for determining employer liability to plaintiff's Title VII sexual harassment claims. Additional briefing related to Title VII is unnecessary, however, because the par-

ties' submission of evidence is sufficient to enable the court to rule on defendants' motion for summary judgment. *See Ponticelli*, 16 F.Supp.2d at 428 (applying *Faragher/Ellerth* standard without additional briefing); *Seepersad v. D.A.O.R. Security, Inc.*, 1998 WL 474205 (S.D.N.Y. Aug.12, 1998) (Sotomayor, J.) (same).

lam that she had no problem with him and had not reported him for sexual harassment. (*Id.*) According to D.A.O.R., this statement reveals that Sowemimo was aware of complaint procedures and never availed herself of them.

However, it is not clear from Sowemimo's written description of her conversation with Islam whether she meant merely to deter him from filing a disciplinary report, or whether her assurances to him reflected that she had not, in fact, ever complained to D.A.O.R. about Islam's harassment. The conversation also contradicts Sowemimo's sworn deposition testimony that she complained to Burret and Cabreja in August, 1995 at the main office of D.A.O.R. that she was being harassed, and that she was told to expect a meeting. No meeting followed, and D.A.O.R. took no action to investigate Islam's actions.

Taking the evidence in a light most favorable to Sowemimo, the court can not say that D.A.O.R. has met its burden in establishing both elements of its affirmative defense for the purposes of summary judgment. Given Sowemimo's sworn testimony, triable issues of fact exist as to whether D.A.O.R. took reasonable care in preventing and correcting sexual harassment in its workplace following Sowemimo's alleged complaint in August, 1995. Thus, D.A.O.R.'s motion for summary judgment relating to plaintiff's claim of sexual harassment under Title VII is denied.

2. D.A.O.R. liability under the HRL and NYCHRL

Courts have analyzed employer liability for sexual harassment claims under the HRL and NYCHRL with reference to the pre-*Faragher/Ellerth* Title VII standard. Prior to *Faragher* and *Ellerth*, the Second Circuit required a Title VII plaintiff to show "that a specific basis exists for imputing the conduct that created the hostile environment to the employer" in order to make out a prima facie case. *See Ponticelli*, 16 F.Supp.2d at 429–430 (quoting

*Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 715 (2d Cir.1996)). An employer could be held liable for the harassment perpetrated by one of its supervisors if: (a) the supervisor was at a sufficiently high level in the company, or (b) the supervisor used his or her actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship, or (c) the employer provided no reasonable avenue for complaint, or (d) the employer knew (or should have known) of the harassment but unreasonably failed to stop it. *See Torres v. Pisano*, 116 F.3d 625 (2d Cir.1997) (citations omitted).

HRL and NYCHRL claims have followed this standard, although New York courts have stated that "an employer cannot be held liable for an employee's discriminatory act unless the employer became a party to it by encouraging, condoning, or approving it." *State Div. of Human Rights v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 687, 496 N.Y.S.2d 411, 487 N.E.2d 268 (1985) (citations omitted).

> An employer's calculated inaction in response to discriminatory conduct may, as readily as affirmative action, indicate condonation. An employer may disprove this condonation by a showing that the employer reasonably investigated a complaint of discriminatory conduct and took corrective action. Thus, employer liability under the HRL is very similar to the fourth prong of the *Torres* test, except that actual notice, rather than constructive notice, appears to be required under the HRL.

*Ponticelli*, 16 F.Supp.2d at 433 (internal citations omitted).

If Sowemimo did, as she states in her deposition, complain to Burret and Cabreja in August, 1995 about Islam, then D.A.O.R. was given actual notice of sexual harassment. It is not entirely clear how high Burret and Cabreja are located within the hierarchy of D.A.O.R., but they do appear at least to be charged with respon-

sibility for relaying employee complaints to company management; that responsibility, coupled with their failure to respond to Sowemimo's complaint, is sufficient to impute liability to D.A.O.R. *See Torres*, 116 F.3d at 636–37. Once again construing the evidence favorably for plaintiff, the question of fact as to whether D.A.O.R. reasonably investigated and took corrective action regarding Sowemimo's allegation precludes summary judgment on plaintiff's sexual harassment claim under the HRL and the NYCHRL.

### 3. Individual liability of Islam

 Plaintiff has also sued Islam in his individual capacity. This circuit has made clear that individuals may not be held personally liable under Title VII. *See Tomka*, 66 F.3d at 1313. However, § 296(6) of the HRL states that it shall be an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so." N.Y.Exec.Law § 296(6). Based on this language, a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the HRL and the NYCHRL as an "aider and abettor." *Tomka*, 66 F.3d at 1317; *DeWitt v. Lieberman*, 1999 WL 13236, at * 12 (S.D.N.Y. Jan.13, 1999) (Scheindlin, J.). Sowemimo's allegations that Islam harassed her verbally and groped her physically are sufficient to hold Islam liable as an aider and abettor. Accordingly, defendants' motion for summary judgment is denied as to plaintiff's claim against Islam for sexual harassment under the HRL and the NYCHRL.

### IV. Plaintiff's claim against D.A.O.R. for retaliation

 Title VII provides that "it shall be unlawful for an employer to discriminate against any employee because the employ-

ee has opposed any practice made an unlawful employment practice by this subchapter. . . ." 42 U.S.C. § 2000e–3(a). The objective of this section is to forbid an employer from retaliating against an employee once an employee opposes the employer's unlawful actions. *See Manoharan v. Columbia University College of Physicians & Surgeons*, 842 F.2d 590, 592 (2d Cir.1988) (Goettel, J.).[3]

 Courts have developed a three step procedure to allocate the burden of producing proof in a claim of retaliation. *See Donato v. Plainview–Old Bethpage Central School District*, 96 F.3d 623, 633 (2d Cir.1996). First, plaintiff must establish a prima facie case. The plaintiff's burden at this stage is de minimis. *Id.* at 634. Second, if the plaintiff makes out a prima facie case, the defendant has the burden of articulating a legitimate non-discriminatory reason for its actions. Third, if the employer carries its burden, the plaintiff has the opportunity to demonstrate by a preponderance of the evidence that the reason proffered by the defendant is a pretext for discrimination. In the summary judgment context, this means that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision. *Gallo*, 22 F.3d at 1225.

 To establish a prima facie case of retaliatory discharge, plaintiff must show: i) her participation in a protected activity known to defendant; ii) an employment action disadvantaging plaintiff; and iii) a causal connection between the protected activity and the adverse employment action. *Donato*, 96 F.3d at 633–34.

---

**3.** Retaliation claims under the HRL and the NYCHRL, like sexual harassment claims, are analytically identical to those under Title VII

for the purpose of summary judgment. *See Ponticelli*, 16 F.Supp.2d at 435, n. 3.

■ By reporting Islam's harassment to D.A.O.R.'s Burret and Cabreja and alleging sexual harassment in her statement pursuant to D.A.O.R.'s investigation into the September 12, 1995 incident, Sowemimo engaged in protected activity known to defendant. *See Tomka,* 66 F.3d at 1295 (complaints internal to company constitute protected activity). Sowemimo suffered an adverse employment action when she was fired. Accordingly, Sowemimo meets the first and second requirements of a prima facie case.

Sowemimo also adduced sufficient evidence to establish a causal connection between the protected activity and the adverse employment action. Sowemimo was fired about a month after complaining to D.A.O.R. about being harassed. Sowemimo also argues that Worrell admitted that her allegations in the wake of the fighting incident contributed to her termination, citing testimony by Worrell that he fired her in part because she filed "false statements." Although D.A.O.R. contests Sowemimo's interpretation of Worrell's comments, "proof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Manoharan,* 842 F.2d at 593. Thus, Sowemimo has made out a prima facie case and the burden shifts to D.A.O.R. to show a legitimate, non-retaliatory reason for her termination.[4]

■ D.A.O.R. maintains that Sowemimo was fired for gross misconduct because she left her post and physically attacked Islam during the early morning of September 12, 1995. D.A.O.R. conducted an investigation, primarily by interviewing employees who described responding to shouts and finding Islam and Sowemimo grappling with each other. Based on this investigation, Worrell claims that he became satisfied that Sowemimo acted without provocation. D.A.O.R. also cites Sowemimo's confrontation with Barbieri prior to September, 1995 as evidence that Sowemimo was an unsatisfactory employee warranting dismissal. D.A.O.R.'s offer of proof satisfies its burden of articulating a legitimate, non-retaliatory reason for terminating Sowemimo.

■ The question for the court then becomes whether the record contains evidence to support Sowemimo's contention that D.A.O.R.'s proffered reason was merely a pretext for retaliation—evidence sufficient to require a trial before a trier of fact. *See Quinn,* 159 F.3d at 769. Sowemimo points out that D.A.O.R.'s investigation of the September 12, 1995 incident relied heavily on the statement provided by Islam, who by that point had allegedly harassed Sowemimo repeatedly, and according to Sowemimo, had been informed by her that she was considering reporting his harassment. Sowemimo has also questioned additional aspects of the investigation cited by D.A.O.R. to justify her termination. Among her contentions are that the investigation relied on witness statements from employees who did not see the beginning of the physical altercation; that a witness confirming Sowemimo's version of events was ignored; and, that Sowemimo was not given the opportunity to meet with Worrell prior to the date when she was called to the office and fired. As described above, Sowemimo's description of events surrounding the September 12, 1995 altercation, including who struck the first blow, differs markedly from that offered by Islam. Also, as already noted, there is a strong temporal connection between Sowemimo's termination and her complaints of harassment to D.A.O.R. officials. Construing the evidence in the light

---

4. Sowemimo also claims that D.A.O.R. fired her in part because it knew about a preliminary and final order of protection she obtained against Islam. However, it appears from the dates on the preliminary and final orders (November 8, 1995 and January 10, 1996, respectively) that they were not issued until after Sowemimo was fired. Assuming the dates are correct (an assumption Sowemimo can challenge at trial), the protection orders can not be said to have contributed to the firing.

most favorable to Sowemimo, there is a sufficient basis "for a trier of fact to doubt the persuasiveness of the company's proffered evidence and ultimately to find that the reasons offered by [D.A.O.R.] for [Sowemimo's] dismissal were pretextual." *Quinn*, 159 F.3d at 769. Accordingly, defendant's motion for summary judgment of Sowemimo's claim against D.A.O.R. for retaliatory discharge is denied.[5]

## V. Plaintiff's Title VII, HRL and NYCHRL claims of racial discrimination against DHS and Barbieri

Plaintiff also asserts under Title VII, the HRL and the NYCHRL that she was discriminated against by DHS and Barbieri on the basis of her race and ethnicity. In plaintiff's view, Barbieri recommended that Sowemimo be removed from the Park Avenue Women's Shelter following Sowemimo's altercation with Islam because Sowemimo is a black woman of Nigerian ethnicity. As evidence of Barbieri's discriminatory motive, Sowemimo refers the court to a summer 1995 incident when Barbieri allegedly called Sowemimo a "black nigger" because Sowemimo refused to violate D.A.O.R. policy and prop open certain exit doors as Barbieri requested. DHS, while refuting Sowemimo's allegation and denying that Barbieri was motivated by race, devotes the bulk of its brief

to arguing that neither DHS nor Barbieri served as Sowemimo's "employer" as required by Title VII and the parallel New York statutes.[6]

As both parties acknowledge, during the period of Sowemimo's employment D.A.O.R. provided unarmed security guards to DHS pursuant to contract. The contract provides, inter alia, that "employees of [D.A.O.R.] who are employed by [D.A.O.R.] to perform work under this Agreement are neither employees of the City nor under contract to the City and [D.A.O.R.] alone is responsible for their work, direction, compensation and personal conduct while engaged in this agreement." (Martinez Aff. Ex. B at 45.) The contract further states that the parties agree that "[D.A.O.R.] is an independent contractor, and not an employee of [DHS] or the City of New York, and ... [D.A.O.R.] covenants and agrees that neither it nor its employees or agents will hold themselves out as, nor claim to be, officers or employees of the City of New York, or of any department, agency or unit of the City of New York ..." (*Id.*) By itself, however, this contractual language is not dispositive, since courts have developed formulations that go beyond mere labels in assessing whether a defendant is an employer.

---

**5.** In opposing summary judgment, Sowemimo alleges as an additional basis for her retaliation claim that D.A.O.R. was aware of her sexual harassment assertions because she filed criminal charges against Islam, and Islam reported her charges to D.A.O.R. officials shortly before plaintiff's termination. Plaintiff did not offer this factual basis for her retaliation claim in her original complaint, but nevertheless included it in her memoranda of law after obtaining Islam's report to D.A.O.R. during the course of discovery. (*See* Ofodile Aff. at 2 (describing exhibit 8 to affidavit as "produced or received, and kept by D.A.O.R.")). In opposing plaintiff's motion for leave to amend her complaint, *see supra* at n. 1, defendants asked that Sowemimo be barred from alleging this additional factual basis for her retaliation claim. The court denied plaintiff's motion for leave to amend, and thus the court does not rely on plaintiff's

allegations surrounding her criminal charge in denying defendants' motion for summary judgment. If plaintiff introduces evidence at trial concerning D.A.O.R.'s knowledge of her criminal charge, her proper course will be to file a motion to conform the pleadings to the evidence pursuant to R. 15(b), F.R. Civ. P.

**6.** Title VII makes it unlawful for "employers," "employment agencies," or "labor organizations" to discriminate against individuals based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a). The HRL's proscriptions against unlawful employment discrimination similarly apply solely to employers. *See Tagare v. Nynex Network Systems Co.*, 994 F.Supp. 149, 159 (S.D.N.Y.1997) (Connor, J.) (citing *Scott v. Massachusetts Mut. Life Ins. Co.*, 86 N.Y.2d 429, 633 N.Y.S.2d 754, 657 N.E.2d 769 (1995)).

■ Sowemimo cites two such formulations, the common law agency test and the joint employer theory, to argue that the requisite employer relationship is present. In the common law approach, emphasis is placed on a defendant's right to control the "manner and means" by which work is accomplished. *See Rivera v. Puerto Rican Home Attendants Services, Inc.*, 922 F.Supp. 943, 949 (S.D.N.Y.1996) (Kaplan, J.) (citing *Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir.1993)). Similarly, to show a joint employer situation (whereby two separate legal entities handle certain aspects of their relationship cooperatively) this Circuit has stated that there must be sufficient evidence of immediate control over the employees. *See Clinton's Ditch Cooperative, Co. v. National Labor Relations Board*, 778 F.2d 132, 138 (2d Cir.1985). The important factors in a joint employer inquiry include: hiring and firing procedures; supervision and discipline methods; pay, insurance, and record keeping practices; and participation in the collective bargaining process. *Id.* at 138–39. Courts have applied both the common law agency test and the joint employer theory in determining whether a defendant is an employer within the meaning of Title VII, *see Rivera v. Puerto Rican Home Attendants Services, Inc.*, 922 F.Supp. 943, 949 (S.D.N.Y.1996) (Kaplan, J.), and under both tests, the main focus is on the amount of control or supervision a defendant exerts.[7]

■ The circumstances here make clear that under either common law agency rules or joint employer theory, DHS was not plaintiff's employer. D.A.O.R. received plaintiff's application for employment and ultimately decided to fire her. D.A.O.R. maintained a supervisor at the Park Avenue shelter and had its own established system for disciplining its employees. Although DHS employees made rounds at the shelter and Barbieri filed a report on Sowemimo's confrontation with Islam at D.A.O.R.'s request, this degree of oversight does not establish DHS as Sowemimo's employer under either common law agency rules or joint employer theory. *See Tagare v. Nynex Network Systems Co.*, 994 F.Supp. 149 (S.D.N.Y.1997) (Connor, J.) (observing that under common law agency test "a supervisory relationship is not necessarily inconsistent with independent contractor status"); *Clinton's Ditch Cooperative*, 778 F.2d at 138 (noting that "[a]n employer need not mutely suffer incompetence or misbehavior by its subcontractor's employees in order to avoid status as a joint employer"). D.A.O.R. paid Sowemimo, procured her insurance, and maintained her employee records. Finally, plaintiff has provided no evidence that DHS participated in a collective bargaining process with regard to D.A.O.R. employees. These facts, in addition to the contract between DHS and D.A.O.R., demonstrate that DHS was not Sowemimo's employer under the common law agency test nor under the joint employer theory, and thus defendants' motion for summary judgment is granted as to plaintiff's claims against DHS under Title VII, the HRL, and the NYCHRL.

■ Plaintiff also brings claims under the HRL and the NYCHRL against Barbieri in her individual capacity. As noted above, employees may be held personally liable under the HRL and the NYCHRL (but not under Title VII) if they participate in the conduct giving rise to the discrimination claim. However, liability under the HRL and the NYCHRL must first be established as to the employer/principal before an individual may be considered an aider and abettor. *See DeWitt*, 1999 WL 13236 at *12. Plaintiff's failure to establish the City's liability under the HRL and the NYCHRL eliminates her claims

---

7. The inquiry into a defendant's status under the HRL and NYCHRL similarly focuses on the degree of control exercised by defendant, *see Tagare*, 994 F.Supp. at 159 (collecting cases), and thus the discussion into DHS's status applies to plaintiff's HRL and NYCHRL claims as well as to her Title VII claims.

against Barbieri based on the same statutes. Summary judgment is therefore granted as to plaintiff's claims against Barbieri pursuant to the HRL and the NYCHRL.

## VI. Plaintiff's Section 1981 claim of racial discrimination against DHS

 Sowemimo charges DHS with racial discrimination under 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcement of contracts. In order to establish a claim under section 1981, plaintiff must demonstrate: (1) that she is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) that the discrimination interfered with one of the activities enumerated in section 1981. *See Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir.1993). Sowemimo, as a black woman of African descent, is a member of a racial minority. However, Sowemimo has not sufficiently demonstrated a nexus between Barbieri's alleged racial slur and the report Barbieri made at D.A.O.R.'s request recounting Sowemimo's confrontation with Islam; in other words, Sowemimo fails to show defendant's intent to discriminate on the basis of race. Nor has Sowemimo established that Barbieri or DHS interfered with a contractual relationship. Even if plaintiff could demonstrate that a contract existed with DHS, plaintiff was suspended and terminated by D.A.O.R. Defendants' motion for summary judgment of plaintiff's section 1981 claim is granted.

## VII. Plaintiff's negligence and intentional tort claims against D.A.O.R. and Islam

Plaintiff claims that defendants were negligent in training, supervising, and disciplining Islam. Such a claim is barred by the New York Workers' Compensation Law, and plaintiff's remedy is through the New York State Workers' Compensation Board. *See Seepersad,* 1998 WL 474205 at *6 (citing *Torres,* 116 F.3d at 640). Accordingly, plaintiff's claims based on negligence are dismissed.

 Sowemimo also alleges that she suffered severe emotional distress because defendants subjected her to sexual harassment and retaliated against her once she complained.[8] Such intentional tort claims are permitted as an exception to the Workers' Compensation Law. *See Id.* Under New York law, the tort of intentional infliction of emotional distress comprises four elements: (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress. *Id.* (citing *Howell v. New York Post Co.,* 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)). Only conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" can give rise to claims of intentional infliction of emotional distress. *Id.*

 Sowemimo's allegations are sufficient to sustain a claim for intentional infliction of emotional distress against Islam only. Courts have observed that a plaintiff must allege sexual battery in order to survive a motion for summary judgment in the sexual harassment context. *See Ponticelli,* 16 F.Supp.2d at 440–41 (collecting cases). By claiming that Islam groped her breast, Sowemimo has raised an issue of fact as to whether Islam's conduct rises to the level demanded under New York law.

**8.** Plaintiff appears to direct her complaint against Islam and D.A.O.R., since these are the defendants' responsible for the conduct cited. To the extent that Sowemimo alleges intentional infliction of emotional distress against DHS and Barbieri, plaintiff fails to allege facts sufficient to sustain her claim and it is dismissed.

 As D.A.O.R. correctly argues, however, D.A.O.R. can not be vicariously liable for the intentional infliction of emotional distress, if any, that Islam may have committed, because employers cannot be held liable for the intentional torts committed by employees for personal motives outside the normal scope of their employment. Nor can D.A.O.R. be held liable directly, since even if D.A.O.R. failed to adequately respond to Sowemimo's reports of harassment and discharged her based on a retaliatory motive, such action is not sufficient to meet the high threshold of extreme and outrageous conduct set by New York courts. Accordingly, D.A.O.R.'s motion for summary judgment on plaintiff's claim of intentional infliction of emotional distress is granted as to D.A.O.R. and denied as to Islam.

Finally, plaintiff's third cause of action is brought against Islam for "offensive bodily contact." This cause of action received no attention in defendants' memoranda of law, but the court notes that it also survives the motion for summary judgment. *See Jaffe v. National League for Nursing*, 222 A.D.2d 233, 635 N.Y.S.2d 9 (1st Dep't.1995) (finding in a case of alleged employee harassment that the allegation of a "hard slap on [plaintiff's] backside" by the individual defendant, although falling short of the standard of outrageous conduct necessary to maintain a cause of action for intentional infliction of emotional distress, sustained a claim of assault and battery).

### Conclusion

For the reasons stated above, the defendants' motion for summary judgment is granted in part and denied in part. Summary judgment is granted as to plaintiff's claims against DHS and Barbieri. Summary judgment is also granted as to plaintiff's negligence claims and plaintiff's intentional tort claims against D.A.O.R. Summary judgment is denied as to plaintiff's claims for sexual harassment and retaliatory discharge under Title VII, the HRL, and the NYCHRL against D.A.O.R., plaintiff's claims for sexual harassment under the HRL and the NYCHRL against Islam, and plaintiff's intentional tort claims against Islam.

**IT IS SO ORDERED.**